**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

**UNITED STATES OF AMERICA**,

        Plaintiff,

    v.                                **Criminal Action No. 5:15-CR-36**
                                            Judge Bailey

**MICHAEL J. MARSHALL,
BRANDT STOVER** and
**NICHOLE P. NORTHCRAFT**,

        Defendants.

**ORDER GRANTING DEFENDANT STOVER AND MARSHALL'S
EMERGENCY MOTION TO VACATE THE RESTRAINING ORDERS
AGAINST SUBSTITUTE ASSETS BASED ON RECENT SUPREME COURT RULING**

        Pending before this Court are Defendant Stover and Marshall's Emergency Motion to Vacate the Restraining Orders Against Substitute Assets Based on Recent Supreme Court Ruling [Doc. 106], Magistrate Judge Seibert's Report and Recommendation that the District Court Vacate Part of its Previous Order Because a Decision of the Supreme Court of the United States Changed the Applicable Law [Doc. 135], United States' Objections to Report and Recommendation [Doc. 141], United States' Supplemental Objections to Report and Recommendation in Document 135 [Doc. 142], Defendants Stover and Marshall's Reply to Government's Objections to Report and Recommendation [Doc. 144], Defendant Michael J. Marshall's Motion to Adopt Co-defendant's Reply to Government's Objections to Report and Recommendation [Doc. 145], and United States' Surreply to Document 144 [Doc. 146].

On June 2, 2015, the Government filed a multiple-count Indictment naming Michael J. Marshall, Brandt Stover, Stephen M. Powell,[1] and Nicole P. Northcraft as defendants in an alleged scheme to defraud the Government. [Doc. 1]. This is a complex white collar prosecution in which the Government has given defendants "at least 179 gigabytes of data" in discovery, which is between 5,300,000 and 19,450,000 pages, and it alleges that the defendants illegally procured over $140,000,000 in contract payments from the Government. [Doc. 125-8]. The sheer volume of documents that must be reviewed in this matter will require defendants' attorneys and their firms to spend a significant amount of time and expense to complete.

The Indictment includes forfeiture allegations. [Doc. 1]. Specifically, the Government named sixteen different bank accounts ("BA") and seventeen individual pieces of equipment ("EQ") for which forfeiture is sought. [Id.].

On June 4, 2015, the Government filed Government's *Ex Parte* Application for Post-Indictment Restraining Order to Protect Business Assets Subject to Forfeiture [Doc. 7]. The Government attached thereto an affidavit of Special Agent Jennifer Jezewski, who has worked for the DOD's, Office of Inspector General, Defense Criminal Investigative Service since 2007. In Special Agent Jezewski's affidavit, she stated, "[t]he below financial accounts were not part of direct tracing to proceeds.[2] These Financial Accounts are

---

[1] Stephen M. Powell passed away during the pendency of this case and was formally dismissed by Order entered December 14, 2015 [Doc. 82].

[2] The Magistrate Judge noted that all sixteen bank accounts, including BA11, are listed below in Special Agent Jezewski's affidavit. The undersigned believes that BA11's inclusion on this list was an oversight because the affiant asserted that BA11 is directly traceable on the next page.

subject to substituted assets for the property subject to forfeiture under the forfeiture money judgement in the amount of at least $24,000,000, as set forth in the forfeiture allegations in the indictment." [Doc. 7-2, p. 15].

On the same day the Government filed its application, this Court entered Orders granting the same and restraining various assets belonging to the defendants and businesses under their ownership and/or control. [Docs. 8 & 12].

On July 15, 2015, as ordered by this Court's Order Restraining Business Assets Subject to Forfeiture [Doc. 8], a Memorandum of Understanding ("MOU") was entered between Michael J. Marshall, Brandt Stover, and the United States Marshals Service. [Doc. 125]. The June 4, 2016, Order required that the United States Marshals Service ("USMS") or its' designee, shall, as it deems necessary to preserve the availability and value of the business and their assets: . . . (5) appoint a manager for the business. The manager shall enter into a Memorandum of Understanding ("MOU") with the USMS that details specific duties and obligations. Nothing in the Order or the MOU shall provide any legal, right, title or interest in the property. The USMS has the right to remove and replace this manager for any reason, including but not limited to, violation of the MOU or the Order. [Doc. 8, p. 6]. Further, the MOU contained a provision under "Up Front Payment" that "the USMS will authorize the Business to make a one-time distribution payment of $150,000 to MARSHALL and a one-time distribution payment of $150,000 to STOVER." [Doc. 125].

On March 30, 2016, The Supreme Court of the United States decided **Luis v. United States**, 136 S. Ct. 1083 (2016). The petitioner in **Luis** asked the Court if "pretrial restraint of a criminal defendant's legitimate, untainted assets . . . needed to retain counsel

of choice violates the Fifth and Sixth Amendments." *Id*. at 1088. The Supreme Court stated, "our answer is that the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Id.*, 136 S. Ct. at 1088. The Fourth Circuit is the only circuit that holds pre-conviction restraint of untainted, substitute assets[3] is permissible. See **In re Billman**, 915 F.2d 916 (4th Cir. 1990) *cert. denied*, **McKinney v. United States**, 500 U.S. 952 (1991). *Contra:* **United States v. Gotti**, 155 F.3d 144, 149 (2d Cir. 1998), **In re Assets of Martin**, 1 F.3d 1351 (3d Cir. 1993), **United States v. Floyd**, 992 F.2d 498 (5th Cir. 1993), **United States v. Ford**, 64 F. App'x 976 (6th Cir. 2003), **United States v. Field**, 62 F.3d 246 (8th Cir. 1995), **United States v. Ripinsky**, 20 F.3d 359 (9th Cir. 1994), **United States v. Jarvis**, 499 F.3d 1196 (10th Cir. 2007).

## II. DISCUSSION

As noted by Magistrate Judge Seibert, the Supreme Court's decision in **Luis** represents a sea change in the law. The Court's plurality held that pretrial restraint of untainted assets violates a defendant's Sixth Amendment right to counsel of choice.

As described more fully above, the Government, through its filings and witnesses, prior to the defendants' instant Motion, alleged BA11 was the only tainted asset that could be directly traced to the alleged criminal enterprise. The Government now contends that these accounts are not substitute property, but rather tainted assets.

---

[3] "If tracing the directly forfeitable asset is impossible, the government may seek forfeiture of other property as a substitute asset. If the forfeitable assets are unavailable at the time of conviction, the court may enter an order forfeiting substitute assets up to an equivalent value. In seeking forfeiture of substitute property, the government must show that the directly forfeitable property is unavailable due to an act or omission of the defendant." Heather J. Garretson, *Federal Criminal Forfeiture: A Royal Pain in the Assets*, 18 S.Cal.Rev. L. & Soc. Just. 45, 52–53 (2008) (citations omitted).

This Court finds that the Government cannot change the facts, i.e. that only BA11 can be traced to the criminal enterprise, but can change its position on its theory, i.e. that the assets are tainted under the "but for" test, which will be discussed below. **Lowery v. Stovall**, 92 F.3d 219, 224 (4th Cir. 1996) (judicial estoppel applies to issues of fact, not law or legal theory).

As noted above, the Government is relying solely on the legal argument that the funds in the Eastern Construction & Excavating accounts would not exist "but for" the illegal activity charged in the Indictment. In its Objections to the Report & Recommendation [Doc. 141], the Government argues that the defendants have failed to cite a single Fourth Circuit case disputing or limiting the "but for" test. Yet the Government has failed to cite a Fourth Circuit published opinion which adopted the "but for" test. The "but for" test was discussed and approved in an unpublished opinion in **United States v. Farkas**, 474 Fed.Appx. 349 (4th Cir. 2012). In **Farkas**, the Court approved the use of the but for test in a post-trial determination as to forfeitability, where there was no Sixth Amendment issue. The Fourth Circuit stated:

> The court then considered whether the Government had established the requisite nexus with respect to the funds in the due-from-shareholder and due–from–3201 Partnership accounts. [**United States v. Farkas**, 2011 WL 5101752 (E.D. Va. Oct. 26, 2011)] at *5–6. Given the Government's theory that these funds constitute proceeds of Farkas's crimes, the district court applied the "but for" nexus test first articulated by the Seventh Circuit in **United States v. Horak**, 833 F.2d 1235, 1242–43 (7th Cir. 1987), and since

applied by a number of other courts, *see* **United States v. DeFries**, 129 F.3d 1293, 1313 (D.C. Cir. 1997); **United States v. Nicolo**, 597 F.Supp.2d 342, 346 (W.D. N.Y. 2009), *aff'd,* 421 Fed.Appx. 57 (2d Cir. 2011); **United States v. Ivanchukov**, 405 F.Supp.2d 708, 712 (E.D. Va. 2005); **United States v. Benyo**, 384 F.Supp.2d 909, 914 (E.D. Va. 2005). Pursuant to this test, funds are considered proceeds and therefore deemed forfeitable if "a person would not have [the funds] *but for* the criminal offense." **Nicolo**, 597 F.Supp.2d at 346 (emphasis added) (citation and internal quotation marks omitted).

Applying the "but for" nexus test, the district court held that "[t]he nexus requirement is satisfied by tracing [Farkas's] fraud to the continued viability of TBW to [his] access to the funds sought to be forfeited, demonstrating he obtained such funds indirectly as a result of his crime." **Farkas**, 2011 WL 5101752, at *6. The court reasoned that "the funds defendant obtained from TBW through the due-from-shareholder and due–from–3201 Partnership accounts would not have been available to him but for his fraud, because TBW would not have remained in business in the absence of the bank and wire fraud scheme." *Id.* at *5. The court similarly stated, "TBW was only able to continue its business activities due to the ongoing fraud." *Id.*

474 Fed.Appx. at 359-60.

As noted by the defendants in their response, certain concessions were made by the Government in their Objections.

The Government concedes that "Defendants have made a strong argument, supported by numerous exhibits submitted at the hearing, that there is a sizeable amount of money being restrained that cannot be directly traced to the alleged criminal activity." [Doc. 141, quoting Doc. 135, p. 13].

The Government further concedes that "the funds now in the Eastern accounts came from legitimate contracts earned after Marshall and Stover left N-Powell. [Id., quoting Doc. 135, p. 11].

Furthermore, the Government admits that Judge Seibert is correct when he states that "[t]he undersigned is of the opinion that the Government has only met its burden, regarding direct tracing and showing any asset is indeed tainted, with regard to BA11." Id., quoting Doc. 135, p. 7.

In his Report & Recommendation, Judge Seibert found that:

> Defendants have made a strong argument, supported by numerous exhibits submitted at the hearing, that there is a sizeable amount of money being restrained that cannot be directly traced to the alleged criminal activity. Defendants explain the source of the overwhelming majority of these funds was a private contractor in the oil and gas business in no way connected to any contracts with the United States government, which is the subject of the criminal action.
>
> …
>
> Further, it appears to the undersigned that the funds in dispute have absolutely no connection to the criminal action.

[Doc. 135, pp. 6-7].

This Court concurs. In arguing against the application of the "but for" test, the defendants presented the following via an affidavit of defendant Brandt Stover, to which no objection[4] was made:

5. The work for N-Powell, S-Powell, and RST ended in 2012. The prior 8(a) work was for the federal government.

6. The MW [MarkWest Energy] work in 2015 and 2016 is for a private company on private contracts.

7. The MW work involves the repair and rebuilding of compressor stations, drainage work, and slippage associated with gas lines for private oil/gas projects. This private work is not connected to any government contracting, public bidding, and public procurement process.

8. I never did any MW work when I worked with N-Powell, S-Powell, RST, or any other company listed in the government's allegations. Those companies were not engaged in pipeline work and did not serve the oil/gas industry. I developed the MW work years later and independently of those prior companies.

9. At MW's request, the MW work involves the rental of new equipment from CAT and John Deere companies. MW prefers that new equipment be used on their projects. I have spent millions on new rental equipment for MW work.

10. The MW work involves the use of 30+ hired contract workers on an as-

---

[4] In fact, in its Objections, the Government stated that it did not dispute the facts set forth in defense exhibits 3 through 7, which includes the Stover affidavit [Doc. 141, p. 6].

        needed basis.  Except for my son, almost all of these 30 workers never worked for N-Powell, S-Powell, RST, or the other companies listed in the government's allegations.

11. Based on our accounting records, the private MW work has produced over $2.9 million in receipts in 2015 (between June 1, 2015 and December 31, 2015).  The MW work has generated over $467,000 in receipts in 2016 (between January 1, 2016 to present).  This money currently resides in our bank accounts with Dollar Bank.

12. It is 100% false to claim that I never would have gotten the MW work, but for my work five years ago with N-Powell, S-Powell, RST and the other companies listed in the government's allegations.  The MW work is completely different from those prior jobs.  I have been doing this type of construction work my entire life, starting with work I performed with my father in the coal mine industry.  The private MW work has nothing to do with the previous government contracting.  I started the MW work years after I stopped working for the prior companies.  I never used any money from N-Powell, S-Powell, RST or any other company to start or support the MW work.

[Doc. 144, pp. 4-5; Doc. 125-6].

Under the "but for" nexus test, the Government bears the burden of showing "a substantial connection between the offense and the property sought to be forfeited." **United States v. Farkas**, 2011 WL 5101752, at *2 (E.D. Va. 2011); *see also* **United States v. Herder**, 594 F.3d 352, 364 (4th Cir. 2010) (expressly adopting the "substantial

connection" standard). There must be a causal link between the alleged proceeds and the charged violations. See **United States v. Benyo**, 384 F.Supp.2d 909, 914 (E.D. Va. 2005) (requiring the government "to prove the defendants obtained the allegedly forfeitable property 'as a result of' the illegal activity charged in the Indictment" or, stated alternatively, requiring a showing that defendants "would not have received the [funds] 'but for' the predicate illegal activity."); 21 U.S.C. § 853(a)(1) (requiring proof that defendants obtained the allegedly forfeitable property "as a result of" the illegal activity charged in the Indictment).

It appears to be the Government's position that because some allegedly tainted funds were funneled into Eastern Construction, the company's entire assets are forever and totally tainted. This is even though, in this case, moneys from other sources than the alleged fraud were deposited in the company and that the company subsequently became insolvent and teetered on bankruptcy after the tainted funds were deposited.

This Court agrees with the Magistrate Judge that the evidence offered in support of the "but for" test is insufficient to support the Government's position. Judge Seibert stated:

> The Government presented the Grand Jury and District Court with witnesses, affidavits, documents, and arguments alleging that only one account, BA11, was directly traceable. Now, the Supreme Court has decided a case that changes what monies are available to the Defendants in this case, and, in the eleventh hour, the Government wishes to change its position. On the one hand, even if the undersigned were inclined to give the Government its change of position, it has still failed to demonstrate, with the same level of detail and explanation to the Grand Jury and District Court, that any of the

> other accounts are directly traceable to the alleged criminal enterprise. On the other hand, Defendants have made a strong argument, supported by numerous exhibits submitted at the hearing, that there is a sizeable amount of money being restrained that cannot be directly traced to the alleged criminal activity. Defendants explain the source of the overwhelming majority of these funds was a private contractor in the oil and gas business in no way connected to any contracts with the United States Government, which is the subject of the criminal action. In its Response, the Government presently does not contest that BA7 and BA 12 through BA16 are purely substitute assets. ECF No. 115 at 7. The undersigned is of the opinion that the Government has only met its burden, regarding direct tracing and showing any asset is indeed tainted, with regard to BA11. Further, it appears to the undersigned that the funds in dispute have absolutely no connection to the criminal action.

[Doc. 135, pp. 6-7].

Some of the testimony from the Government's own witnesses contradicts the "but for" arguments. During the testimony of Wendy Spaulding, a CPA working for the prosecution, the Government claimed that $1.5 million in "illegal proceeds" went into Eastern bank accounts in 2011. [Doc. 125-17]. Yet, on cross-examination, Ms. Spaulding testified that funds from other sources (beyond N-Powell, S-Powell, and RST) were also deposited into Eastern in 2011 and 2012. [Doc. 133, Hearing Transcript at 12-13]. Moreover, in 2013 (as the government's witness and spreadsheets established), over $2.2 million was deposited into the Eastern account from other projects that the Government

11

does not contest.  [See Doc. 133, Hearing Transcript at 16-17; Doc. 125-18].  In total, over $9.1 million of untainted money went into Eastern from 2011-2013.  [Doc. 133, Hearing Transcript at 47; Doc. 125-18].  Given this influx of funds, the Government has not proven that Eastern would not exist "but for" the original N-Powell contracts.

The defendants have consistently argued for the application of the "lowest intermediate balance" accounting rule, which was accepted in *In re Dameron*, 155 F.3d 718, 724 (4th Cir. 1998) (noting that courts use the lowest intermediate balance rule to resolve cases where trust property has been commingled).  In *Luis*, the plurality opinion discussed that the trial courts have experience with the tracing of tainted assets and cited to a particular section of Scott's Law of Trusts which discusses with approval the lowest intermediate balance method of tracing funds.  136 S.Ct. at 1095, citing 4 A. Scott, Law of Trusts § 518, pp. 3309-3314 (1956).

Under the lowest intermediate balance rule, an account commingling illegal proceeds and legitimate funds is deemed to contain traceable proceeds only when "the balance has not fallen below the amount of the tainted deposit."  *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159-60 (2d Cir. 1986); *In re Dameron*, 155 F.3d 718, 724 (4th Cir. 1998).  Here, it is undisputed that the Eastern bank account balance fell to $1,849.52 as of May 31, 2013.  [Doc. 125-3].  The Government alleges improper funds were deposited only in 2011 and 2012.  Therefore, those allegedly improper funds from 2011 and 2012 had to be spent by May 31, 2013, because the bank balance fell to $1,849.[5]

---

[5] The low bank balance also contradicts the Government's theory that Eastern would not have existed "but for" the 2011 and 2012 contracts.  Eastern nearly went bankrupt in May 2013.  [Doc. 125-3].  Eastern rebounded by developing different work in a new industry, contracts which the Government admits are legitimate.  This low bank balance in

[Doc. 133, Hearing Transcript at 26-29; 36-39].  Accordingly, under the lowest intermediate balance rule, none of the assets of Eastern are tainted assets.

The Government also argues that any claim to the funds is waived by the Court mandated Memorandum of Understanding between the defendants and the United States Marshals Service.  This Court concurs with Judge Seibert that the effect of the MOU is superceded by the Supreme Court's decision in *Luis*.

Accordingly, this Court finds that all of the restrained funds except BA11 are available for the payment of attorneys' fees.  It must be noted, however, that the Court in *Luis* expressed concern over granting *carte blanche* for attorneys fees.  The *Luis* plurality stated that "[Courts] have experience separating tainted assets from untainted assets, just as they have experience determining how much money is needed to cover the costs of a lawyer.  See, *e.g.,* . . . 28 U.S.C. § 2412(d) (courts must determine reasonable attorneys' fees under the Equal Access to Justice Act); . . ..  We therefore see little reason to worry, as Justice KENNEDY seems to, that defendants will 'be allowed to circumvent [the usual forfeiture rules] by using ... funds to pay for a high, or even the highest, priced defense team [they] can find.'"  136 S. Ct. at 1095-96.

For that reason, this Court will require the submission of a proposed budget from defense counsel, to be filed *ex parte*, for review by the Court.

For the reasons stated above, this Court finds that:

1.    All of the restrained assets except BA11 are available for the reasonable fees and expenses of defense counsel; and

---

2013 further contradicts any notion that Eastern's business in 2015 and 2016 was obtained "as a result of" deposits ending in 2012.

13

2.  Counsel for defendants Marshall and Stover are directed to prepare and submit proposed budgets for the remainder of this case.

3.  The Magistrate Judge's Report and Recommendation **[Doc. 135]** is **ADOPTED**, Defendant Stover and Marshall's Emergency Motion to Vacate the Restraining Orders Against Substitute Assets Based on Recent Supreme Court Ruling **[Doc. 106]** is **GRANTED**, and the United States' Objections **[Docs. 141 & 142]** are **OVERRULED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record.

**DATED:** July 18, 2016.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE